KRISTIN S. ESCALANTE, Cal. Bar. No. 169635
Email: EscalanteK@sec.gov
YOLANDA OCHOA, Cal. Bar No. 267993
Email: OchoaY@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     vs.<br><br>DAMON V. HOVANNISIAN, VERNON S. HOVANNISIAN, VINCENT G. HOVANNISIAN, and EDDIE ARAKELIAN<br><br>          Defendants, | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

**JURISDICTION AND VENUE**

1.   The Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21A, 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u-1, 78u(e) & 78aa(a).

2.   Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district under Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because defendants Vernon S. Hovannisian, Vincent G. Hovannisian, and Eddie Arakelian reside in this judicial district and because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

4.     This case involves insider trading in the securities of International Rectifier Corporation ("International Rectifier"). On August 20, 2014, International Rectifier and Infineon Technologies AG ("Infineon") publicly announced that Infineon would acquire International Rectifier, causing International Rectifier's stock price to jump over 47% that day. Shortly before that announcement, in late July 2014, defendant Damon Hovannisian had misappropriated material, nonpublic information about the pending acquisition from his spouse, a high-level employee of International Rectifier who was working on the deal. In breach of his duties of trust and confidence owed to his spouse, Damon Hovannisian (through a friend) purchased shares in International Rectifier in advance of the public announcement of the acquisition. In addition to trading himself, Damon Hovannisian also tipped his father (defendant Vernon Hovannisian), his brother (defendant Vincent Hovannisian), and a family-friend (defendant Eddie Arakelian), who each traded on this tip. Damon Hovannisian concealed all of this trading and tipping from his spouse.

5.     Each of the defendants (Damon, Vernon and Vincent Hovannisian, and Eddie Arakelian) promptly sold the stock they had bought after the August 20, 2014 public announcement, collectively reaping more than $155,000 in profits from their illicit trades.

6.     By engaging in this conduct, the defendants violated Sections 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. With this complaint, the SEC seeks permanent injunctions, disgorgement of ill-gotten gains, and civil penalties.

## DEFENDANTS

7.     Damon V. Hovannisian, age 41, resides in Scottsdale, Arizona. At all relevant times discussed in this complaint, his spouse was employed by International Rectifier as director of operations (referred to herein as "Spouse.")

8.     Vernon S. Hovannisian, age 70, resides in Fresno, California. He is the father of

Damon Hovannisian.  Vernon Hovannisian runs a real estate investment and property management company in Fresno.

9. Vincent G. Hovannisian, age 32, resides in Fresno, California.  He is Damon Hovannisian's brother.  Vincent Hovannisian is employed by his father's property management company in Fresno, and has held himself out as the vice president of this property management company.

10. Eddie Arakelian ("Arakelian"), age 55, resides in Clovis, California.  He is a long-time family friend of the Hovannisians.  Arakelian is the president of a company that sells wholesale floor coverings in Fresno County.

## RELATED ENTITIES AND INDIVIDUALS

11. International Rectifier is a power management technology and semiconductor company that manufactures advance circuit devices and integrated power systems and components.  Before being acquired by Infineon, International Rectifier was a Delaware Corporation with its principal executive offices in El Segundo, California.  International Rectifier's common stock traded on the NYSE under the symbol "IRF" until January 2015, when International Rectifier's merger with Infineon became effective and International Rectifier ceased operating as an independent company.

12. Infineon is a German-based semiconductor manufacturer.  On January 13, 2015, Infineon completed its acquisition of International Rectifier.

13. The individual referred to herein as "Spouse" was the director of operations for International Rectifier in 2014 and, in that role, was one of the International Rectifier employees who worked on the International Rectifier-Infineon acquisition deal.

## FACTS

**A.   Spouse's Acquisition of Material, Nonpublic Information About the Pending Acquisition of International Rectifier**

14. On August 20, 2014 at 9:05 am PST, International Rectifier and Infineon issued a joint press release announcing that the two semi-conductor companies had signed a definitive agreement under which Infineon would acquire International Rectifier for $40 per share in an all-

1  cash transaction valued at approximately $3 billion.

2    15.   On the day of the announcement, the trading price of International Rectifier's shares
3  closed at $39.10, up 47.21% from the prior date's closing price of $26.56, and the trading volume
4  increased by 19,815%, from 184,189 shares on August 19, 2014 to 36,680,300 shares on August 20,
5  2014.

6    16.   In the approximately 40-day period preceding this announcement, International
7  Rectifier's executives and its board of directors held several meetings to discuss Infineon's
8  acquisition proposal. To help keep this information confidential, the pending acquisition was
9  referred to internally at International Rectifier under the code name "Project Hawaii."

10    17.   International Rectifier shared information about the pending acquisition with
11  employees only on a need-to-know basis, and employees who were informed about the pending
12  acquisition were cautioned that the matter was highly confidential and were told that they were not
13  permitted to share any information about it with anyone who was not involved with Project Hawaii.
14  Employees who were involved with the project were required to sign a non-disclosure agreement
15  acknowledging that all information they obtained regarding Project Hawaii was "non-public,
16  confidential, and proprietary in nature" and that they would maintain the project and related
17  information as confidential. International Rectifier also set up a private exchange server so that
18  only employees involved with Project Hawaii could upload and access information related to the
19  pending acquisition.

20    18.   Spouse first learned about the pending acquisition of International Rectifier in mid-
21  July 2014, and was one of only six employees from International Rectifier's Chandler, Arizona
22  office who were provided information about Project Hawaii before the August 20, 2014 public
23  announcement. At the time, Spouse was International Rectifier's director of operations.

24    19.   On July 14, 2014, Spouse signed a non-disclosure agreement acknowledging that she
25  understood that all information regarding Project Hawaii was "non-public, confidential and
26  proprietary in nature" and that she would treat the project and related information as confidential.

27    20.   In connection with Project Hawaii, Spouse was responsible for collecting documents
28  and other information necessary to respond to numerous due diligence questions from Infineon and

she participated in several calls and meetings regarding Project Hawaii.

**B.  Damon Hovannisian's Misappropriation of Material, Nonpublic Information Regarding the Pending Acquisition of International Rectifier from Spouse**

21. Damon Hovannisian misappropriated material, nonpublic information regarding the pending acquisition of International Rectifier from Spouse. He obtained access to the information about the pending acquisition because Spouse worked on the diligence project for Project Hawaii while she was home and when she was on vacation with him in late July 2014.

22. During the weeks leading up to the August 20, 2014 acquisition announcement, Spouse worked very long hours on Project Hawaii. She took work calls regarding Project Hawaii while at home and responded to emails on evenings and during the weekend.

23. From Sunday, July 27, 2014 through Thursday, July 31, 2014, Damon Hovannisian and Spouse took a trip to visit his parents in Fresno, California. Spouse spent a large part of the trip working on Project Hawaii. Throughout this period, Damon Hovannisian observed Spouse working.

24. On July 31, 2014, Spouse had to cut her vacation short to return to Arizona to meet with others from International Rectifier regarding Project Hawaii. Damon Hovannisian drove her to the airport that morning, so she could return to Arizona for work. He stayed behind in Fresno for another day.

25. On or about mid-August, before the August 20, 2014 announcement, Damon Hovannisian confided in a friend that "something big" was taking place at International Rectifier. He also told this friend that Spouse was travelling more than usual for work because of what "was happening" at International Rectifier.

**C.  Defendants' Trading Based on Material, Nonpublic Information Regarding the Pending Acquisition of International Rectifier**

26. As detailed below, Damon Hovannisian misappropriated material, nonpublic information about the pending acquisition of International Rectifier from Spouse. He then traded on this information and tipped his father (Vernon Hovannisian), brother (Vincent Hovannisian), and friend (Arakelian), who each also traded on this information.

27. In tipping the other defendants, Damon Hovannisian knowingly or recklessly breached the duty of trust and confidence he owed to Spouse, and disclosed that information for a personal benefit.

28. Damon Hovannisian also knowingly or recklessly breached the duty of trust and confidence he owed to Spouse by trading in the securities of International Rectifier on the basis of material non-public information about the pending acquisition of International Rectifier.

29. Vernon Hovannisian, Vincent Hovannisian, and Arakelian knew or had reason to know that Damon Hovannisian had disclosed material, non-public information about International Rectifier for a personal benefit in breach of a duty he owed to Spouse, and each intentionally or recklessly traded based on the information provided to them.

**1.    Arakelian's August 2014 Trades in International Rectifier**

30. On July 31, 2014, after dropping Spouse off at the airport so she could return home for work, Damon Hovannisian spent the day with Arakelian at the Arakelian horse farm.

31. During that visit, Damon Hovannisian provided Arakelian with material, nonpublic information about the pending acquisition of International Rectifier, in breach of his duty of confidentiality to Spouse, with the intention that Arakelian would trade on this information. Damon Hovannisian provided this information to Arakelian for Damon Hovannisian's personal benefit. Arakelian knew or should have known that he received that information in breach of Damon Hovannisian's duty to Spouse, and that Damon Hovannisian tipped Arakelian for a personal benefit.

32. That night, after having spent the day with Damon Hovannisian, Arakelian sent himself an email with nothing but the term "IRF" in the body of the message. At the time, "IRF" was the ticker symbol for International Rectifier.

33. The next day, on August 1, 2014, Arakelian called his investment adviser (hereinafter "Adviser") to purchase shares of International Rectifier. At Arakelian's instructions, on this same day, Adviser purchased 2,500 of International Rectifier in Arakelian's trust account for $62,632.

34. Before this trading in International Rectifier, Arakelian did not usually invest in individual stocks. In fact, since May 1, 2012, he had traded only in mutual funds. Further, the

purchase of International Rectifier shares in August 2014 was the first transaction in Arakelian's trust account since December 2013.

35. Arakelian sold his entire position in International Rectifier less than three hours after the International Rectifier-Infineon announcement on August 20, 2014. He realized profits of $35,781.20 from the sale.

**2.    Vincent Hovannisian's August 2014 Trades in International Rectifier**

36. In early August 2014, Damon Hovannisian provided his brother, Vincent Hovannisian, material, nonpublic information about the pending acquisition of International Rectifier, in breach of his duty of confidentiality to Spouse, with the intention that Vincent Hovannisian would trade on this information. Damon Hovannisian provided this information to Vincent Hovannisian for Damon Hovannisian's personal benefit. Vincent Hovannisian knew or should have known that he received that information in breach of Damon Hovannisian's duty to Spouse, and that Damon Hovannisian tipped for a personal benefit.

37. On August 6, 2014, while on the phone with his brother, Vincent Hovannisian logged on to his Scottrade trading account to make his first purchase in International Rectifier shares.

38. On August 6, 2014, Damon Hovannisian called Vincent Hovannisian at 6:58 a.m. PST, and the two were on this call for approximately 7 minutes. During this call, Vincent Hovannisian logged on to his Scottrade account. By 7:24 a.m. PST, Vincent Hovannisian had sold shares in other companies and used these funds to submit an order to purchase 200 shares of International Rectifier. Vincent Hovannisian then called Damon Hovannisian, at 7:32 a.m. PST, less than 10 minutes after submitting this order.

39. Later that same day, Vincent Hovannisian deposited $5,000 in cash to one of his bank accounts, and then transferred the $5,000 from this bank account to his Scottrade account. Though Vincent Hovannisian initiated the transfer on August 6, the same day he spoke with Damon Hovannisian, the $5,000 was not available for use in his Scottrade account until two days later when, on August 8, 2014, Vincent Hovannisian used these funds to purchase an additional 200 shares of International Rectifier.

40. The total purchase price for the 400 shares of International Rectifier Vincent Hovannisian bought on August 6 and August 8 was $10,004.88.

41. Vincent Hovannisian sold his entire position in International Rectifier shares on August 22 and 25, 2014, for realized profits of $5,635.12.

**3.    Vernon Hovannisian's August 2014 Trades in International Rectifier**

42. Damon Hovannisian spent time with Vernon Hovannisian from July 29 through August 1, 2014 in Fresno, California. After Damon Hovannisian returned to Arizona, the two called each other on August 6, 7 and 8. Between July 29 and August 8, 2014, Damon Hovannisian provided Vernon Hovannisian material, nonpublic information about the pending acquisition of International Rectifier, in breach of his duty of confidentiality to Spouse, with the intention that Vernon Hovannisian would trade on this information. Damon Hovannisian provided this information to Vernon Hovannisian for Damon Hovannisian's personal benefit. Vernon Hovannisian knew or should have known that he received that information in breach of Damon Hovannisian's duty to Spouse, and that Damon Hovannisian tipped for a personal benefit.

43. Less than two weeks after Damon Hovannisian spent several days visiting him, Vernon Hovannisian traded in International Rectifier.

44. On August 11, 2014, Vernon Hovannisian contacted Adviser, who in addition to being Arakelian's financial adviser was also Vernon Hovannisian's adviser. During that call, Vernon Hovannisian instructed Adviser to purchase 5,000 shares of International Rectifier in Vernon Hovannisian's brokerage account, which had been inactive for over ten years.

45. Because Vernon Hovannisian's brokerage account had been inactive since at least 2002, Adviser had to check that Vernon Hovannisian still had an account before confirming that he could make the trade Vernon Hovannisian was requesting.

46. The very next day, on August 12, 2014, Vernon Hovannisian called Adviser again and asked that he buy an additional 3,000 shares of International Rectifier for him.

47. Given that Vernon Hovannisian's brokerage account had no funds, on August 12, 2014, Vernon Hovannisian delivered a $203,538 check to Adviser's office to fund his purchase of International Rectifier stock.

48. Vernon Hovannisian sold his entire position in International Rectifier on August 20, 2014, less than three hours after the announcement of the International Rectifier and Infineon deal. He realized profits of $111,145.23 from the sale of these shares.

49. On August 26, 2014, Vernon Hovannisian withdrew the total proceeds from his sales, which were approximately $311,000. After withdrawing these funds, Vernon Hovannisian asked Adviser to close his brokerage account.

### 4. Damon Hovannisian's Trading in International Rectifier

50. Damon Hovannisian also bought shares in International Rectifier before the August 20, 2014 public announcement. Spouse did not know that he had purchased these shares.

51. On or about August 13, 2014, Damon Hovannisian asked a friend (hereinafter, "Person A") to purchase $5,000 worth of shares in International Rectifier for him in Person A's account. Damon Hovannisian told Person A that "something big was happening" at International Rectifier, where Spouse worked.

52. Person A agreed to purchase shares of International Rectifier for Damon Hovannisian, and on or about August 13 or 14, 2014, Damon Hovannisian gave Person A $5,000 in cash to execute the purchase. That day, Person A purchased $5,994.01 worth of International Rectifier stock: $5,000 for Damon Hovannisian and approximately $1,000 for Person A.

53. Damon Hovannisian shared material, non-public information regarding International Rectifier's pending acquisition with Person A, in breach of a duty owed to Spouse, so that Person A would purchase shares for him in Person A's account, thus concealing his trading in International Rectifier stock.

54. Shortly after the August 20, 2014 public announcement regarding the International Rectifier and Infineon deal, Damon Hovannisian instructed Person A to sell the shares of International Rectifier that had been purchased for him. Accordingly, on August 22, 2014, Person A sold all shares of International Rectifier that Person A had purchased, for a total profit of $3,194.49.

55. On or about September 9, 2014, Person A put $5,000 in cash and a check in the amount of $2,665.80, which was Damon Hovannisian's share of the profits from the sale of the

shares of International Rectifier stock, in an envelope inside of a safe at work, and let Damon Hovannisian know that his money and check were in the safe.

56. Damon Hovannisian did not tell Spouse that he had traded in International Rectifier, and intentionally concealed his trading by having Person A execute the trades in Person A's account.

### D. Materiality of the Non-Public Information that the Defendants Traded On

57. Damon Hovannisian misappropriated confidential and non-public information about the pending acquisition of International Rectifier from Spouse and tipped that information to Vernon Hovannisian, Vincent Hovannisian, and Arakelian. Damon Hovannisian also traded on that information through Person A's brokerage account.

58. A reasonable investor would have viewed the information about the pending acquisition of International Rectifier as being important to his or her investment decision. In fact, when International Rectifier's pending acquisition was publicly announced on August 20, 2014, its stock price rose approximately 47.21% and its trading volume increased by 19,815% from 184,189 shares on August 19, 2014 to 36,680,300 shares on August 20, 2014.

59. Members of the investing public were harmed by Defendants' gaining of an advantageous market position through their trading in the shares of International Rectifier Corporation based on misappropriated material, nonpublic information.

### E. Damon Hovannisian's Breach of His Duty to Spouse For a Personal Benefit

60. Damon Hovannisian owed a duty of trust and confidence to Spouse, including a duty to abstain (i) from trading on the material, non-public information he acquired from her concerning the pending acquisition of International Rectifier, and (ii) from disclosing such information to others.

61. Damon Hovannisian breached this duty of trust and confidence when he traded in the securities of International Rectifier based on material, nonpublic information he had improperly obtained from Spouse. Damon Hovannisian had Person A execute his trades in Person A's account in order to conceal his trading from Spouse.

62. Damon Hovannisian also breached the duty of trust and confidence he owed to

Spouse when he tipped Vernon Hovannisian, Vincent Hovannisian, and Arakelian material non-public information with the intention that they trade on the information, which, they in fact did. Damon Hovannisian received a personal benefit from tipping Vernon Hovannisian, Vincent Hovannisian, and Arakelian.

**F.      Vernon Hovannisian, Vincent Hovannisian, and Arakelian Are Liable as Tippees**

63.   Vernon Hovannisian, Vincent Hovannisian, and Arakelian each knew or had reason to know that Damon Hovannisian's disclosure of material, nonpublic information regarding Spouse's employer was a breach of the duty Damon Hovannisian owed Spouse.  Vernon Hovannisian, Vincent Hovannisian, and Arakelian each understood that Damon Hovannisian was improperly tipping them inside information for a personal benefit.

64.   While in knowing possession of material, nonpublic information about International Rectifier, Vernon Hovannisian, Vincent Hovannisian, and Arakelian each intentionally or recklessly used the information to trade.

## CLAIM FOR RELIEF

## Fraud in Connection With The Purchase Or Sale Of Securities

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Against All Defendants)**

65.   The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

66.   Damon Hovannisian misappropriated information concerning the pending acquisition of International Rectifier from Spouse at a time when this information was nonpublic and held by Spouse as confidential information related to her employer.

67.   By trading on, and disclosing that material, nonpublic information concerning International Rectifier to Vernon Hovannisian, Vincent Hovannisian and Arakelian, Damon Hovannisian misappropriated confidential information from Spouse for security trading purposes, in breach of a duty of trust or confidence owed to her.

68.   Damon Hovannisian tipped Vernon Hovannisian, Vincent Hovannisian and Arakelian by providing them material nonpublic information concerning the pending acquisition of International Rectifier with the intent to benefit his father (Vernon Hovannisian), his brother

(Vincent Hovannisian), and long-time family friend (Arakelian).

69. Damon Hovannisian, directly or indirectly, personally benefited, or expected to personally benefit, from disclosing that material, nonpublic information to his family and close family friend.

70. At the time they traded in the securities of International Rectifier, Vernon Hovannisian, Vincent Hovannisian and Arakelian each knew or was reckless in not knowing that he was in possession of material nonpublic information concerning International Rectifier's securities.

71. By engaging in the conduct described above, Damon Hovannisian, Vernon Hovannisian, Vincent, and Arakelian, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange: (a) employed devices, schemes or artifices to defraud; and/or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

72. By engaging in the foregoing conduct, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Damon Hovannisian, Vernon Hovannisian, Vincent Hovannisian, and Arakelian committed the alleged violations.

**II.**

Issue judgements, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Damon Hovannisian, Vernon Hovannisian, Vincent Hovannisian, and Arakelian and their agents, servants, employees, attorneys and those persons in active concert or participation with them, who receive actual notice of the order by personal service or otherwise, from violating Sections 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

//

### III.

Order Damon Hovannisian to disgorge his and Person A's illegal trading profits described herein, plus prejudgment interest.

### IV.

Order Vernon Hovannisian to disgorge his illegal trading profits described herein, plus prejudgment interest.

### V.

Order Vincent Hovannisian to disgorge his illegal trading profits described herein, plus prejudgment interest.

### VI.

Order Arakelian to disgorge his illegal trading profits described herein, plus prejudgment interest.

### VII.

Order Damon Hovannisian, Vernon Hovannisian, Vincent, and Arakelian to pay civil penalties under Section 21A of the Exchange Act, 15 U.S.C. § 78u-1.

### VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: August 10, 2017

*/s/ Kristin S. Escalante*

KRISTIN S. ESCALANTE
YOLANDA OCHOA
Attorney for Plaintiff
Securities and Exchange Commission